IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SHADEESHA BROWN, *et al.*, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 11 Civ. 1068 (AJN) |
| | : | |
| THE CITY OF NEW YORK, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
THE TESTIMONY OF PLAINTIFFS' EXPERT WITNESS MARCIA KNIGHT**

PEPPER HAMILTON  LLP

Lawrence Byrne
Martin S. Bloor
Linda Regis-Hallinan
Chris Howard

The New York Times Building
37th Floor
620 Eighth Avenue
New York, NY  10018-1405
212.808.2700 (Tel)
212.286.9806 (Fax)

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..……………………………………………………………………ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 3

      A.     Shadeesha Brown's Allegations .................................................................. 3

      B.     Meetings with Marcia Knight ..................................................................... 3

      C.     Dr. Knight's Psychological Report .............................................................. 4

ARGUMENT .............................................................................................................................. 6

I.      LEGAL STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY ................... 6

II.     THE COURT SHOULD EXCLUDE PLAINTIFFS' EXPERT BECAUSE HER
      OPINIONS LACK A RELIABLE FOUNDATION......................................................... 8

      A.     Dr. Knight's Opinions Are Unreliable Because They Are Based Entirely
              On Uncorroborated Self-Serving Information ........................................ 8

      B.     Dr. Knight's Opinions Regarding Causation Are Unreliable Because They
              Fail to Address Alternatives for Brown's Alleged Injuries .................................. 11

CONCLUSION.......................................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amorgianos v. Amtrak*, 303 F.3d 256 (2d Cir. 2002) ....................................................8

*Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549 (S.D.N.Y. 2012) ......................1

*Claar v. Burlington N. R.R. Co.*, 29 F.3d 499 (9th Cir. 1994).....................................11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)....................1, 2, 6, 7, 8, 13

*Discover Fin. Servs. v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501 (S.D.N.Y. 2008)..........................6

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .............................................................7

*Heller v. Shaw Indus. Inc.*, 167 F.3d 146 (3d Cir. 1999)................................................8

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................6, 7

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) ......................7

*R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244 (S.D.N.Y. 2010)..............................8

*Robinson v. Sanctuary Record Groups, Ltd.*, 542 F. Supp. 2d 284 (S.D.N.Y. 2008)....................8

*U.S. Info. Sys. v. IBEW Local Union No. 3*, 313 F. Supp. 2d 213 (S.D.N.Y. 2004)....................11

*Zaremba v. GMC*, 360 F.3d 355 (2d Cir. 2004) .........................................................8

*Zwillinger v. Garfield Slope Housing Corp.*, No. 94-cv-4099 (SMG), 1998 U.S. Dist. LEXIS 21107 (E.D.N.Y. Aug. 17, 1998).......................................................11

## STATUTES AND RULES

42 U.S.C. § 1983.............................................................................................................1

Fed. R. Evid. 702 ...........................................................................................1, 2, 6, 14

## OTHER AUTHORITIES

Claudia Baker and Cessie Alfonso, *Forensic Validity of a PTSD Diagnosis*................................9

Edna B. Foa, *Effective Treatments for PTSD, Practice Guidelines from the International Society for Traumatic Stress Studies* (The Guildford Press) (2d ed. 2009)..............................9

U.S. Dep't of Vet. Affairs Nat'l Ctr. for PTSD, *National Center for PTSD Briefing* (Aug. 2012) .......................................................................................................................9

Defendants file this motion to exclude the proffered testimony of the Plaintiffs' proposed expert witness Marcia Knight, Ph.D., pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence.

## PRELIMINARY STATEMENT

In this action, Plaintiff Shadeesha Brown seeks to recover money damages against Defendants for allegedly being forced to stand naked on August 6, 2010, while officers executed a valid search warrant in an apartment that contained fifty-nine glassines of heroin, nineteen baggies of crack/cocaine, forty-two baggies of marijuana, narcotics paraphernalia, and one round of .9 millimeter ammunition.  This Court granted Defendants summary judgment motion as to several of Brown's claims and all of those of her co-defendant Gabriel Perez.  (Docket No. 52).  The parties stipulated to dismissal of all 42 U.S.C. § 1983 claims against the City of New York, (Docket No. 41).  Thus, the only claims remaining in this action are Plaintiff Brown's civil rights and state common law claims against the individual defendants relating to her alleged detention in the nude.[1]

Plaintiff identified Dr. Marcia Knight as an expert who may be called as a witness at trial.  Dr. Knight is a clinical psychologist and neuropsychologist.  She was hired by Plaintiffs' counsel to perform a psychological evaluation of Brown.  Dr. Knight and Brown met a total of three times.  After two of those three meetings, Dr. Knight drafted a Psychological Report, concluding that Brown suffers from Acute Posttraumatic Stress Disorder ("PTSD") and Major

---

[1]   The remaining state common law claim is for intentional infliction of emotional distress ("IIED").  Notably, were the Court to grant Defendants' Motion and exclude Dr. Knight's testimony, Plaintiff would be unable to establish her IIED claim.  Courts have made clear that to prevail on an IIED claim under New York law, a plaintiff must present medical evidence.  *See, e.g.*, *Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 565 (S.D.N.Y. 2012) ("Courts routinely grant summary judgment against plaintiffs where they have failed to present medical evidence demonstrating severe emotional injury.").  Here, Dr. Knight's Report and testimony represent the only evidence Brown has put forth of her emotional injury.

Depressive Episode ("depression") caused by Defendants' conduct during the execution of the search warrant on August 6, 2010.

As demonstrated below, Dr. Knight's opinions lack a reliable foundation and her testimony should be excluded for a number of reasons.  First, Dr. Knight's diagnoses and causation opinion are unreliable because they are based entirely on uncorroborated and self-serving information provided by Brown and her attorney.  In testimony and in her own published articles, Dr. Knight claims that an evaluation should include interviews of persons other than the patient, such as family members or significant others.  Yet, here, Dr. Knight violated her own advice and did not attempt to verify Brown's statements through interviews with friends, family, teachers, or co-workers.  Dr. Knight failed to review any files other than the Notice of Claim.  Second, Dr. Knight's testimony is unreliable because she fails to demonstrate that she accounted for likely alternative explanations for Brown's symptoms.  For instance, Dr. Knight failed to probe into Brown's emotional state prior to the August 6th incident, and in particular, failed to address several likely alternative causes, such as Brown's miscarriage as a young teenager, her possible history of physical and sexual abuse, and Brown's abandonment by her father at a young age.

As demonstrated below, these fundamental problems in Dr. Knight's methodology render her opinion unreliable under *Daubert* and Rule 702.  Dr. Knight's proposed testimony, therefore, should be excluded.

**STATEMENT OF FACTS**

A.    **Shadeesha Brown's Allegations**

Plaintiff Shadeesha Brown alleges that on August 6, 2010, she was forced to stand naked, at gunpoint, for forty minutes while police officers executed a search warrant at the apartment where Brown and her then-boyfriend, Gabriel Perez, were overnight guests.  (Am. Compl. (Docket No. 10) ¶¶ 36, 45-47).  Brown alleges that five or six officers entered the bedroom where she was sleeping with Perez.  (*Id*. at ¶ 41).  One officer allegedly pulled the bed sheet off of her and refused to allow her to put on clothes.  (*Id*. at ¶ 43).  Brown claims she was not permitted to cover herself or to dress for approximately forty minutes.  (*Id*. at ¶ 47).  Brown and Perez were taken to the police precinct following the search and were subsequently released without being charged with any violation.  (*Id*. at ¶ 53-54).

Brown and Perez filed a Notice of Claim with the Comptroller of the City of New York (the "Notice of Claim") on August 18, 2010.  Bloor Decl., Ex. A.[2]  On February 15, 2011, Brown and Perez filed a complaint against several officers and the City of New York.  In the complaint, Brown claimed that she suffered "severe emotional distress" due to the officers' conduct.  (Docket No. 10, at ¶ 95).

B.    **Meetings with Marcia Knight**

At her attorney's direction and funding, Brown met with Dr. Knight on September 16, 2010 and October 5, 2010.  Bloor Decl., Ex. B (Deposition of Marcia Knight, June 13, 2012, ("Knight Dep.") at 17:4-25, 18, 19:1-2).  These two meetings lasted a total of "three to four hours."    (*Id*. at 20:24-25).    Following these two meetings, Dr. Knight completed her

---

[2]    References to "Bloor Decl." are to the declaration of Martin S. Bloor, dated March 13, 2013, and submitted in support of the Memorandum of Law in Support of Defendants' Motion to Exclude the Testimony of Plaintiffs' Expert Witness Marcia Knight.

Psychological Report on Brown.  Bloor Decl., Ex. C (Psychological Report of Shadeesha Brown by Marcia Knight, dated Oct. 12, 2010, (the "Report") at 1).  Brown and Dr. Knight met again on November 12, 2010.  (Knight Dep. at 88:18-23).

At the first meeting, Dr. Knight administered to Brown three tests:  the Beck Depression Inventory – II ("BDI-II"); the Minnesota Mutliphasic Personality Inventory – Form 2RF ("MMPI-A"); and the Traumatic Symptom Inventory ("TSI").[3]   Dr. Knight admitted that she has no formal training in administering or interpreting either the BDI-II or TSI tests.  (Knight Dep. at 74).  During the first two meetings that spanned three to four hours, Brown complained of, *inter alia*, discomfort when undressed in front of anyone, disturbed sleep, and anxiety. (Report at 6-7).

Notably, at the third and final meeting, Brown's alleged symptoms had already started to decline.  (Knight Dep. at 90:7-9) ("Q. Did she express to you at any point that she was feeling better?  A. Yes, she seemed to be better at that time."); (*id*. at 89:15-20) (observing that Brown "was starting to eat better . . . [n]ot as hypervigilant," and "[h]er depression was easing"). Dr. Knight's prognosis states that Brown would "require at least one to three years of at least monthly appointments."  (Report at 9).  Yet, on her third visit, it appeared that Brown was rapidly improving, which Dr. Knight admitted would make her question her prognosis of Brown. *See* (Knight Dep. at 93:21-94:7).

C.     **Dr. Knight's Psychological Report**

In her Report, which was drafted prior to the third meeting, Dr. Knight concludes that Brown suffers from PTSD and depression.  (Report at 7).  In creating the Report, the only

---

[3]  The Report indicates that the  MMPI-2RF was administered, which is the test for adults.  (Report at 5). Knight claimed at her deposition that this was a transcribing error, and in reality, the MMPI-A test, which is meant for adolescents, was actually administered instead.  (Knight Dep. at 71:7-11).

record Dr. Knight reviewed was the Notice of Claim.  (Report at 1).  When asked what she generally does in the course of an evaluation, Dr. Knight mentioned that she "might interview family members or significant others, teachers."  (Knight Dep. at 11:2-3).  Similarly, in a publication entitled "Earning a Living Outside of Managed Mental Health Care," Dr. Knight wrote that "[a]t the examination, I interview the patient and ideally significant others."  Bloor Decl., Ex. D, at 188.

> Yet, in this instance, Dr. Knight did not interview any of Brown's friends, family, or colleagues to verify the information she was told by Brown.  Dr. Knight did not review any of Brown's medical files or her employment or academic records before drafting the Report, even though in that same publication Dr. Knight states that school records are helpful to assess a patient's functioning after an alleged traumatic event.  *Id*.  Indeed, as Dr. Knight herself acknowledged, she did not even ask Brown's family or friends whether Brown suffered from any symptoms of post-traumatic stress and depression prior to the incident on August 6, 2010:

> > Q. Do you know if Ms. Brown had any of these
> > symptoms prior to this incident?
> > A. Not that -- I was not aware of any, no.
> > Q. What did you do to find out if she had any
> > symptoms prior?
> > A. I asked her, her prior history.
> > Q. So, it was solely based on Ms. Brown's statements
> > to you, that you made that statement?
> > A. Yes.
> > Q. Did you speak to anyone else about whether or not
> > she had those symptoms before August 6, 2010?
> > A. No.

(Knight Dep. at 38:6-17).

> Similarly, nowhere in the Report does it indicate that Dr. Knight ruled out other causes for Brown's symptoms, such as:  Brown's miscarriage around age 15 or 16; any potential history of physical and sexual abuse; and Brown's abandonment by her father.  Thus, even

without (1) taking any steps to verify Brown's statements; (2) probing into potentially traumatic events and Brown's mental state before the August 6th incident; or (3) addressing other likely alternative explanations for Brown's symptoms, Dr. Knight wrote in her Report "that the police action on" August 6, 2010 "is the primary etiological factor in the diagnoses" of PTSD and depression. (*Id*. at 8-9).

In light of the fundamental problems in the methodology employed by Dr. Knight to formulate her causation opinion, Defendants move to exclude her Report and testimony on the basis that it is unreliable.

## ARGUMENT

## I.   LEGAL STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

Federal Rule of Evidence Rule 702 permits the presentation of scientific and technical knowledge or opinion testimony by a "witness who is qualified as an expert" only if such testimony:

(1)    will help the trier of fact to understand the evidence or to determine a fact in issue;

(2)    is based upon sufficient facts or data;

(3)    is the product of reliable principles and methods; and

(4)    results from the reliable application of principles and methods to the facts of the case.

Fed. R. Evid. 702.  This rule "incorporates the principles enunciated in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)[,] in which the Supreme Court held that trial courts have a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable." *Discover Fin. Servs. v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 503 (S.D.N.Y. 2008) (internal quotations omitted);  *see also Kumho Tire Co. v. Carmichael*, 526 U.S.

137, 147 (1999) (expanding *Daubert* analysis to all expert opinions and evidence, not only testimony as to scientific matters).

Assessing reliability involves a two-step analysis. First, the court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592-93. To do so, the trial judge should assess whether the method or theory "can be and has been tested." *Id*. at 593.[4] Second, the court must decide whether that reasoning or methodology is appropriately applied to the case at hand, and whether the expert is applying it in a manner that ensures a reliable linkage between the facts and the conclusions. *Daubert*, 509 U.S. at 592; *Kumho Tire Co.*, 526 U.S. at 158.

In short, the trial court must decide not only whether the methodology is reliable for some purposes, but also whether it is a reliable way "to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant." *Kumho Tire Co.*, 526 U.S. at 154.

Expert testimony that is merely "subjective belief or unsupported speculation" should be excluded. *Daubert*, 509 U.S. at 590; *see also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

---

[4] This includes a consideration of whether the methodology has been subjected to peer review and publication, the degree to which it has been accepted in the relevant profession or discipline, and the known or potential error rate of the methodology. *Daubert*, 509 U.S. at 593-95. For methods or theories that are not purely scientific, a court should follow the same general approach, adapting the *Daubert* criteria as needed for the purpose of assessing reliability. *Kumho Tire Co.*, 526 U.S. at 150.

As "[t]he party proffering the expert," Plaintiff "has the burden to demonstrate by a preponderance of the evidence that its expert witness satisfies these criteria." *R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244, 252-253 (S.D.N.Y. 2010) (citing *Zaremba v. GMC*, 360 F.3d 355, 358 (2d Cir. 2004)).

## II.     THE COURT SHOULD EXCLUDE PLAINTIFFS' EXPERT BECAUSE HER OPINIONS LACK A RELIABLE FOUNDATION

The Second Circuit has made it clear that "[t]o warrant admissibility, . . . it is critical that an expert's analysis be reliable at every step." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002).   To ensure an expert's analysis is reliable, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."   *Id.*   As detailed below, Dr. Knight made critical missteps throughout her evaluation of Plaintiff by:  (1) basing her opinion solely on the facts as set forth in the Notice of Claim and Plaintiff's own self-serving statements; and (2) failing to test her opinion against likely alternative explanations.   As a result, Dr. Knight's Report and testimony should be precluded.

### A.     Dr. Knight's Opinions Are Unreliable Because They Are Based Entirely On Uncorroborated Self-Serving Information

*Daubert* requires that experts verify and test each aspect of their testimony. *Amorgianos*, 303 F.3d at 266; *see also Heller v. Shaw Indus. Inc.*, 167 F.3d 146, 155 (3d Cir. 1999) ("The reliability analysis applies to all aspects of an expert's testimony [including] . . .  the facts underlying the expert's opinion . . . ."); *Robinson v. Sanctuary Record Groups, Ltd.*, 542 F. Supp. 2d 284, 292 (S.D.N.Y. 2008) (finding that expert's opinion and testimony insufficiently reliable where expert's "methodology is founded on hearsay supplied by Plaintiffs' counsel -- hardly a source of first-hand, independent expert knowledge").

In the context of evaluating a patient for PTSD, because most symptoms are self-reported, it is critically important to determine whether a patient is fabricating the symptoms for secondary gain.  *See* Edna B. Foa, *Effective Treatments for PTSD, Practice Guidelines from the International Society for Traumatic Stress Studies* 35 (The Guildford Press) (2d ed. 2009) ("More than other mental disorders, PTSD is particularly susceptible to malingering because it is a highly compensable disorder . . . in the context of civil litigation.").  As the National Center for PTSD states:

> A particularly important consideration in the forensic assessment of PTSD is the fact that most symptoms of the disorder are entirely self-reported. (Note that some symptoms such as an exaggerated startle response can be objectively observed.)  In cases where secondary gain is involved, which would include most forensic cases, tests of malingering should be administered in conjunction with the PTSD assessment. *If measures of malingering are not used in the assessment, the individual's report of his or her own symptoms may be characterized as fabrication or exaggeration.*

Claudia Baker and Cessie Alfonso, *Forensic Validity of a PTSD Diagnosis*, Nat'l Ctr. for PTSD, http://www.ptsd.va.gov/professional/pages/forensic-validity-ptsd.asp (last accessed March 10, 2013) (emphasis supplied).[5]

Here, Dr. Knight based her entire report on the facts in the Notice of Claim, which was provided to her by Brown's attorneys, and Brown's own uncorroborated self-reported symptoms.[6]  (Knight Dep. at 33:21-25); *see also* (*id*. at 61:13-18) (acknowledging that the term optical rape used in the Report "was something I was citing directly from that Notice of Claim, I

---

[5]   The National Center for PTSD was created in 1989 within the Department of Veterans Affairs in response to a Congressional mandate (PL 98-528) to address the needs of Veterans with military-related posttraumatic stress disorder.  *See National Center for PTSD Briefing*, at 2 (Aug. 2012), *available at* http://www.ptsd.va.gov/about/press-room/pdf/NCPTSDBriefingDocument2012.pdf (last accessed March 10, 2013).

[6]   Dr. Knight admitted to intensifying Brown's statements and inserting stronger language into the Report. *See, e.g.*, (Knight Dep. at 150:2-20) (using Brown's description that the officers "stared" at her and changing it to "gawk"); (*id*. at 145:16-25) (changing "asking" to "protest").

was quoting it").  That Dr. Knight failed to verify Brown's statements is particularly surprising considering her testimony and written publications that states it is "ideal[]" to do so.  *See* (*Id*. at 11:2-3) (indicating that she generally interviews family members and significant others and teachers); Ex. D, at 188 (stating that "[a]t the examination, I interview the patient and ideally significant others").  Rather than following her own advice, Dr. Knight did not attempt to verify Brown's reports of disturbed sleep, hypervigilence, and anxiety through interviews with friends, relatives, and/or co-workers.  (Knight Dep. at 35:20-22).

Moreover, Dr. Knight also failed to heed her own advice when it came to what records to review.  In her article on earning a living as an expert witness, Dr. Knight instructs readers, "[a] typical evaluation usually starts with a review of relevant records."  Ex. D, at 188.  When evaluating adolescents, Dr. Knight advises, school records "are helpful to assess premorbid functioning following psychological trauma as well."  *Id*.  Even though she instructs others conducting psychological evaluations to review school records, here, Dr. Knight failed to follow her own advice.  She never requested or reviewed any of Brown's school records (or even medical records) to support her diagnoses.  *See* (Knight Dep. at 68:22-24) ("Q. Your opinion in this report is based solely on the story that [Brown] told you; is that correct? A. Yes.").

In fact, Dr. Knight admitted that she did not review any other document other than the Notice of Claim to verify Brown's symptoms:

> Q. Other than the Notice of Claim, did you review any other documents?
> A. No.
> Q. Did you speak to any other people besides Ms. Brown?
> A. No.
> Q. . . . You say in the first sentence that "Shedeesha is an 18-year-old woman who was forced to stand naked for an extended period of time."  Where did you get that?
> A. From Ms. Brown and I believe -- yes, and also from the Notice of Claim.

> Q. These words, forced to stand naked, are these
> your words or are these Ms. Brown's words?
> A. Well, they're based on what she told me and what
> I read in the Notice of Claim.
> Q. Did you do anything, other than reading the
> Notice of Claim and speaking to Ms. Brown, to verify that
> statement?
> A. No.
> Q. Did you do anything to get comfortable with
> whether or not Ms. Brown was being truthful with you?
> A. Um, I felt comfortable she was being truthful.
> Q. What did you base that comfort on?
> A. Her consistency with what she said, with what was
> in the Notice of Claim.

*Id*. at 35:10-25.  Instead of corroborating Brown's statements through *any* means, Dr. Knight relies entirely on self-serving information provided by Brown and her attorney to diagnose Brown with PTSD and with depression.

In light of:  (1) the importance of corroborating self-reported claims of PTSD; (2) Brown's financial motivation to falsify or exaggerate her symptoms; (3) Dr. Knight's reliance on only the facts in the Notice of Claim and Brown's self-serving statements; and (4) Dr. Knight's own claims that an evaluation should include corroborating interviews, Dr. Knight's method of diagnosis is unreliable and her testimony should be excluded.

**B.      Dr. Knight's Opinions Regarding Causation Are Unreliable Because They Fail to Address Alternatives for Brown's Alleged Injuries**

Expert testimony that fails to test a hypothesis by examining alternative explanations for causation is unreliable and should be excluded.  *U.S. Info. Sys. v. IBEW Local Union No. 3*, 313 F. Supp. 2d 213, 235, 238 (S.D.N.Y. 2004) (noting that "an expert should address evidence that contradicts his conclusions" and "must demonstrate that he has adequately accounted for likely alternative explanations in order for his testimony to be reliable"); *Zwillinger v. Garfield Slope Housing Corp.*, No. 94-cv-4099 (SMG), 1998 U.S. Dist. LEXIS 21107, *19 (E.D.N.Y. Aug. 17, 1998) ("To establish specific causation, other possible causes for

the symptoms experienced by plaintiff should be excluded . . . .”); *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (excluding testimony where expert failed to consider other likely causes for the plaintiffs’ injuries).

        Here, Dr. Knight concluded “that the police action on [August 6, 2010] . . . is the primary etiological factor in the diagnoses indicated above.”  (Report at 8-9).  Yet, the Report does not exclude – and gives no indication that Dr. Knight even considered – Brown’s emotional state prior to the August 6th incident, including several likely alternative causes for Brown’s symptoms such as:  (1) a miscarriage around age 15 or 16; (2) a possible history of physical and sexual abuse; and (3) Brown’s abandonment by her father at a young age.  *See* (Knight Dep. at 115:10-12) (admitting that her diagnosis would change if Brown exhibited symptoms of PTSD before August 6, 2010); *see also* (*id.* at 125:5-13) (stating that she asked Brown specific and detailed questions about her symptoms *after* August 6, 2010, but only “general questions” regarding symptoms prior to that date).

        First, Dr. Knight’s report does not address whether Brown’s miscarriage due to stress as a young teenager could be the primary cause in her current diagnosis.  Brown informed Dr. Knight that her miscarriage – which Dr. Knight acknowledged is a “traumatic event” – was due to stress.  (*Id.* at 120:17-18; 122:25—123:1).  Dr. Knight also stated that it was possible that Brown acted differently after the traumatic event of having a miscarriage.  (*Id.* at 123:3-11).  Far from probing deeper into Brown’s emotional state before the incident at issue, however, Dr. Knight never even inquired whether Brown had any symptoms of PTSD after her miscarriage. (*Id.* at 123:7-11) (“Q. Would you say it’s possible that [Brown] might have had symptoms of PTSD after her first miscarriage? A. I have no idea. Q. Did you ask? A. No.”).  The Report does not rule out Brown’s miscarriage at age 15 or 16 as a cause of her symptoms.

Second, Dr. Knight could not remember whether she even asked Brown if, prior to the incident at issue, Brown had ever been physically or sexually assaulted. (*Id*. at 130:11-25.) Dr. Knight stated that she had "no idea" whether Brown had been sexually assaulted. (*Id*. at 130:15). Similarly, Dr. Knight did not know, nor did she ask, whether Brown had ever been sexually abused. (*Id*. at 130:23-25). When asked whether physical or sexual abuse could have had an impact on Brown's mental state, Dr. Knight observed that such abuse could have an impact. (*Id*. at 134:14-23). Dr. Knight's report, however, does not rule out – or even address – Brown's possible history of sexual and physical violence as a cause for her diagnoses.

Third, Dr. Knight does not address, or rule out, Brown's abandonment at a young age by her father as a cause for her alleged emotional distress. (*Id*. at 123:21) ("Q. Did you ask her about her father? A. I believe she doesn't know her father. Q. Did you ask her how not knowing her father made her feel? A. No."). When pressed, Dr. Knight admitted that being abandoned by a father could have an impact on Brown's mental state. (*Id*. at 134:23). Dr. Knight also admitted that Brown's family situation was something that she would want to know before making a diagnosis of PTSD. (*Id*. at 124:12-14); *see also* (*id*. at 124:7-11) ("Q. Does her family situation cause her stress or anxiety? A. Not that I'm aware. Q. Did you ask? A. No, not specifically, no."). Here again, the Report does not analyze whether Brown's lack of relationship with her father could cause her alleged symptoms.

In sum, Dr. Knight made no effort – as is required by *Daubert* – to investigate and rule out likely alternatives causes for the diagnoses of PTSD and depression. Because Dr. Knight failed to analyze likely alternative explanations for Brown's alleged emotional problems, her report is wholly unreliable and should be excluded under Rule 702.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be granted and Dr.

Knight's proposed testimony should be excluded.

Dated:  March 13, 2013                                   Respectfully submitted,


                                                         /s/ Martin S. Bloor
                                                         Lawrence Byrne
                                                         Martin S. Bloor
                                                         Linda Regis-Hallinan
                                                         Chris Howard
                                                         Pepper Hamilton LLP
                                                         The New York Times Building
                                                         37th Floor
                                                         620 Eighth Avenue
                                                         New York, NY  10018-1405
                                                         212.808.2700 (Tel)
                                                         212.808.2738 (Fax)

                                                         *Attorneys for Defendants*