UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
SHADEESHA BROWN and GABRIEL PEREZ,　　　:

             Plaintiffs,　　　　　:

     - against -　　　　　　　　:

                      :　　　11CV1068(AJN)

THE CITY OF NEW YORK, BRIAN McALEAR,　　:
KEITH HOCKADAY, FREDERICO MARTINEZ,　　:
JOAQUIN MORALES, ROBERT DOWNES,　　　　:
THOMAS ALBANO, GERARD FLOOD, WILLIAM　:
HART, TIMOTHY MURPHY, KENYETTA ROUSE,　:
and THOMAS LONGA,　　　　　　　　　　　　:

           Defendants　　　　:
------------------------------------------------------------------x

MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO EXCLUDE
THE TESTIMONY OF PLAINTIFF'S EXPERT,
WITNESS, DR. MARCIA KNIGHT

MICHELSTEIN & ASSOCIATES, PLLC.
Attorneys for Plaintiffs

Richard A. Ashman
Eugene M. Bellin

485 Madison Avenue - Suite 1300
New York, New York 10022
Tel. (212) 588-0880
Fax  (212) 588-0811

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. ii

PRELIMINARY STATEMENT ...................................................... 1

STATEMENT OF FACTS .............................................................. 2

ARGUMENT .................................................................................. 8

I.      DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S MEDICAL
        EXPERT'S TESTIMONY UNDER DAUBERT AND FEDERAL
        RULE OF EVIDENCE 702 SHOULD BE DENIED ..................... 8

        A.    Dr. Knight's Evaluation and Report of Plaintiff's Condition Was
              Based On the Most Reliable Information Available ................... 9

        B.    Dr. Knight's Diagnoses of Plaintiff's PTSD and Depression Have
              Sufficient Reliability To Be Admitted At Trial Under the More
              Flexible Standards For Expert Testimony On Psychological Disorders ........... 11

        C.    Dr. Knight's Testimony As to the Etiology of Plaintiff's Psychological
              Disorders Is Sufficiently Reliable To Be Admitted At Trial and
              Its Credibility and Weight Should Be Decided By the Jury ......................... 15

CONCLUSION .............................................................................. 19

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ................... *passim*

*Discepolo v. Gorgone*, 399 F. Supp. 2d 123 (D. Conn. 2005) ............................. 18

*Foreman v. American Road Lines, Inc.,* 623 F. Supp. 2d 1327
(S.D. Ala. 2008) ............................................................................. 15

*Katt v. City of New York*, 151 F. Supp. 2d 313 (S.D.N.Y. 2001), *aff'd in part sub
nom. Krohn v. New York City Police Dept.,* 60 Fed. Appx. 357 (2d Cir. 2003) .... 18-19

*Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137 (1999) ................................. 9, 17

*Lopez v. City of Houston*, No. CIV.A. H-03-2297, 2006 WL 1663374
(S.D. Tex. June 12, 2006) .................................................. 12-13, 14-15, 19

*Mancuso v. Consolidated Edison Co. of New York, Inc.,* 967 F. Supp. 1437
(S.D.N.Y. 1997) ............................................................................. 15

*Redmond v. City of East Point, Ga.,* No. 1:00-CV-2492-WEJ,
2004 WL 6060552 (N.D. Ga. Mar. 29, 2004) ............................................ 12

*Schaefer-Condulmari v. U.S. Airways Group, LLC*, No. CIV.A. 09-1146,
2012 WL 2920375 (E.D. Pa. July 18, 2012) ........................................... 12, 18

*S.M. v. J.K.,* 262 F.3d 914, 921 (9th Cir. 2001), *amended on other grounds*,
315 F.3d 1058 (9th Cir. 2003) ............................................................ 14

*Trafton v. Sunbury Primary Care, P.A.,* 689 F. Supp. 2d 198 (D. Me. 2010) ............ 12, 15

### LAWS, RULES AND REGULATIONS

42 U.S.C. § 1983 ........................................................................... 1

Federal Rule of Evidence 702 ........................................................... 1, 8, 15

### TREATISES AND SECONDARY SOURCES

*Diagnostic and Statistical Manual of Mental Disorders* ................................ 7, 14, 19

Plaintiff Shadeesha Brown respectfully submits this memorandum of law in opposition to Defendants' motion to exclude the testimony of Plaintiff's expert witness, Dr. Marcia Knight, Ph.D. as being unreliable under Federal Rule of Evidence 702 and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (*"Daubert"*).     In this action, Plaintiff asserts claims against Defendant police officers under 42 U.S.C. §1983 and state common law for deprivation of her civil rights and intentional infliction of emotional distress arising out of her encounter with Defendants on August 6, 2010, and seeks damages for, *inter alia*, psychological disorders allegedly caused by their conduct.  For the reasons presented herein, Defendants' motion should be denied in its entirety, and Dr. Knight's testimony should be admitted at trial.

## PRELIMINARY STATEMENT

While the basic facts of Plaintiff's traumatic seizure and forcible display of her nudity by Defendants in the bedroom where she was sleeping in the early morning of August 6, 2010 are uncontested for purposes of this motion, they now seek to bar the testimony of Dr. Knight because of its supposed lack of reliability.  Specifically, it is contended that her diagnosis that Plaintiff suffered from Post-Traumatic Stress Disorder ("PTSD") and conclusion that the primary etiology of the psychological disorders was the incident of August 6, 2010 were not sufficiently reliable because she based them only on information provided by Plaintiff and her attorney, that she didn't seek out additional information from family members and friends, and that she did not take into consideration other prior traumatic events that could have caused her post-traumatic stress disorder.

But the fact remains that when Dr. Knight saw and evaluated Plaintiff on two occasions, administered three well-recognized psychological tests, and prepared her report containing her diagnosis and opinions little more than two months after the incident, there simply was no other information about the incident or Plaintiff's medical condition available – no litigation had begun, no testimony had been given by Plaintiff or anyone else about the incident, no police report had been issued that Plaintiff knew about, and no prior medical records existed because this was her first consultation with a mental health professional.  As Plaintiff told Dr. Knight at that time and testified on two occasions later, she was not subjected to any other traumatic event that affected her so, nor suffered from or been treated for any psychological disorder prior to the incident.   It is telling that Defendants, while attacking Dr. Knight, have not produced any evidence or expert testimony of their own that challenges her diagnosis of Plaintiff's psychological condition nor her conclusion that the encounter with Defendants on August 6, 2010 was the primary causative factor of Plaintiff's condition.

## STATEMENT OF FACTS

As Plaintiff has testified at her "50-h hearing" and her deposition taken in this action, in the early morning of August 6, 2010, she was awakened by police officers who broke down the door and burst into the bedroom of an apartment where she and her boyfriend were sleeping.  (Pl. Dep.,[1] Ashman Decl., Exh. 1, at 27-29; 50-h Dep.,[2] Ashman Decl., Exh. 2, at 20-22)   At gunpoint, she was forced to stand completely naked on the bed with her hands at her side, and then to move and stand in a corner where she stood for

---

[1] "Pl. Dep." refers to the transcript of the deposition of Shadeesha Brown, held on Jan. 5, 2012.
[2] "50-h Dep." refers to the transcript of the 50-h Hearing of Shadeesha Brown, held on Dec. 7, 2010.

about forty minutes, as the police searched throughout the apartment. (Pl. Dep., Ashman Decl., Exh. 1, at 33, 37-38, 44; 50-h Dep., Ashman Decl., Exh. 2, at 24, 27-28) During this time, one of the male police officers in SWAT gear and a mask was holding a gun and watching her in the bedroom, as other male officers came in to look and left. (Pl. Dep., Ashman Decl., Exh. 1, at 29-31, 33, 35-38; 50-h Dep., Ashman Decl., Exh. 2, at 25, 31) The officer guarding her repeatedly refused her requests and those of others to put any clothes on, and demanded she put her hands down when she tried to cover parts of her body, and ultimately handcuffed her arms behind her so she couldn't cover herself. (Pl. Dep., Ashman Decl., Exh. 1, at 35-36, 43; 50-h Dep., Ashman Decl., Exh. 2, at 28-29, 32-33) After around forty minutes, she finally was allowed to dress herself, was escorted by a police officer out of the apartment and taken to a police station where she was held in a cell for four hours, before being released. (Pl. Dep., Ashman Decl., Exh. 1, at 44-45, 47-48; 50-h Dep., Ashman Decl., Exh. 2, at 30-31, 33, 36)

Shortly after the incident, Plaintiff was evaluated and treated by Dr. Knight for her psychological trauma. (Pl. Dep., Ashman Decl., Exh. 1, at 17) As Dr. Knight testified at her deposition, she spent two hours with her in this first session on September 16, talking with her about the incident, and having her take three written psychological tests. (Knight Dep., Ashman Decl., Exh. 3, at 23-24) Three weeks later, on October 5, she saw Plaintiff again for two hours, during which she continued to evaluate Plaintiff's condition and did "supportive therapy." (*Id.* at 27-28) Dr. Knight then completed a 9-page single-spaced Psychological Report, dated Oct. 10, 2010 (a copy of which is appended at Exhibit 4 to the Ashman Decl., filed herewith) containing her evaluation and diagnosis of Plaintiff's

3

psychological condition. (Knight Dep., Ashman Decl., Exh. 3, at 28-29)   She subsequently

saw Plaintiff one more time on November 12, for further treatment.  (*Id.* at 88-89)

Dr. Knight's Report first contains Plaintiff's account of the incident of August 6,

2010, as it was related to her, which is fully consistent in all material respects with

Plaintiff's testimony at her depositions:  that she was made to stand naked for about forty

minutes, and she was not permitted to put any clothing on despite many requests (Ashman

Decl., Exh. 4, at p. 2); that a male officer who was guarding her the whole time, demanded

that she not try cover her breasts or genitals but keep her arms at her sides, and then had her

hands handcuffed behind her for the last ten minutes she was standing (*id.*); that other male

officers came by and stared at her naked body, and she was fearful that one or more might

attack or abuse her (*id.*); and that about forty minutes later, she was allowed to get dressed,

and was escorted outside to a van by a female police officer (*id.*).

The Report further described Plaintiff's complaints, emotions and psychological

condition as a result of this incident that Dr. Knight observed at their first two meetings:

Shadeesha had become "hypervigilant" about her security and privacy, "worried that

someone would come in."   (*Id.* at p. 3)  She felt sadness when she thought about the

incident, and "[s]ometimes the crying was overwhelming and she could not stop." (*Id.* at

pp. 3-4)  She had intrusive thoughts and flashbacks about details of the incident, as well as

recurring nightmares about police officers breaking in on her.  (*Id.* at pp. 4, 7)  She felt

"especially sensitive and vulnerable when she was naked" and was terrified of being seen

naked by men.  (*Id.* at p. 4)  She slept irregularly and at abnormal times, and "she always

felt nervous about being asleep because … she had to be vigilant lest there by another

raid." (*Id.*)

As the Report states, her experience of this incident had a dramatic effect on her lifestyle.   She now "dressed differently," making "sure her whole body was covered" so as not to show any skin.  (*Id.* at p. 5)  When she learned shortly after the incident that she was pregnant, she had extreme anxiety that her emotions from the incident, and nervous conduct resulting from it like smoking, would cause her to miscarry or injure the baby. (*Id.* at p. 4)  Her "interest in sex had decreased" and having sex with her boyfriend made her uncomfortable and their relationship suffered. (*Id.* at pp. 4-5)  She stayed at home more and did not socialize as she previously had enjoyed doing, because of "her fear of seeing police officers." (*Id.* at p. 4)  Her problems sleeping "make it harder for her to focus in school." (*Id.*)

Dr. Knight also observed Plaintiff's demeanor at her office and described it in part in her Report as follows:  "Her affect was appropriate but blunted and she spoke in a monotone.  Her mood was tense and sad.  She was well tuned into her fears and feelings. She become noticeably tense, and had trouble verbalizing, when asked how she would feel if she saw one of the police officers who were at the raid.  There were points when she seemed to be on the verge of tears, but she held them back .... "  (*Id.* at p. 5)

In their first session, Plaintiff was administered three tests – the Beck Depression Inventory – II ("BDI-II"), the Minnesota Multiphasic Personality Inventory – Form A ("MMPI-A")[3], and the Traumatic Symptom Inventory ("TSI").[4]   (Knight, Dep., Ashman Decl., Exh. 3, at 71-73)    The scoring on these tests were based on a "T-score", with a mean of 50 and standard deviation of 10, meaning any score below 40 or above 60 would

---

[3]   Her report identifies this test as "Form 2RF", but during her deposition she clarified that she had given the "Form A" of it for adolescents, not the Form 2RF, which was for adults. (Ashman Decl., Exh. 3, at 71)

[4]   Some of Plaintiff's test answers and score compilations were identified at Dr. Knight's deposition and are appended at Exhibit 5 of the Ashman Decl.

be abnormal. (Ashman Decl., Exh 4, at p. 5 n.1)   She had administered each of these tests to her patients very frequently (two of them at least a hundred times), was familiar with them from her training as a psychologist, has read the manual and journal articles about the TSI test, and has received training in administering the more complicated MMPI-A test. (Ashman Decl., Exh. 3, at 73-74, 80, 85-86)

Dr. Knight reported that on the BDI-II, Ms. Brown "attained a raw score of 34 indicating she had moderate to severe symptoms of [depression]." (Ashman Decl., Exh. 4, at p. 5)   On the MMPI-A, a "well standardized test of personality functioning," her highest clinical scale elevation was on the "Depression" scale with a T-score of 71, and next highest was the "Paranoia" scale with a T-score of 65.   (*Id.* at p. 6)   On the content scales, her highest score was on "Anxiety" with a T-score of 73, and the next highest was on "Cynicism" with a score of 72.   (*Id.*)

On the TSI, which she described as a "measure of post-traumatic stress," she interpreted the test results as showing the "validity indices were within normal limits."   The highest clinical scale elevations in the TSI for Plaintiff were on "Intrusive Experience" ("IE") with a T-score of 75, "Defensive Avoidance" ("DA") scale with a T-score of 74, and "Anxious Arousal" ("AA") with a T-score of 70.   Interpreting these test scores, Dr. Knight stated,

> The combination of the IE and DA scales was a classic post-truamatic stress presentation with Shadeesha reporting both the intrusive and avoidant components of Post-Traumatic Stress Disorder (PTSD).   The elevated AA scale signaled autonomic hyperarousal. All these elevations represented a relatively acute response to the recent traumatic stressor of the police raid.
>
> Significant IE items endorsed by Shadeesha were that she had nightmares, flashbacks, and intrusive memories of the incident. Significant DA items endorsed by Shadeesha were that she tried not to

6

> think about the incident, used thought-stopping to avoid thinking about it, avoided people and places that reminded her of the incident, and experienced emotional numbing.   Significant AA items endorsed by Shadeesha were that she worried about things, felt jumpy, and she was easily startled or frightened by sudden noises.

(*Id.* at p. 6)

The Report's diagnoses of Plaintiff, based on the test results and symptoms reported and observed, were "Acute Posttraumatic Stress Disorder in that Shadeesha was exposed to a traumatic event in which she felt there was a potential threat to her physical integrity to which she responded with intense feelings of fear and helplessness."   In her deposition, Dr. Knight testified that she used for her diagnosis the definition of PTSD and its required components and symptoms from the "diagnostic manual," referring to the "Diagnostic and Statistical Manual of Mental Disorders." (Ashman Decl., Exh. 3, at 101-2)   She also diagnosed "Major Depressive Episode in that [such] symptoms have been present most of the time for at least two weeks." (Ashman Decl., Exh. 4, at p. 8)  She additionally observed that "[t]here is no evidence that Shadeesha had any of the [symptoms of these disorders] prior to the incident with the police on 8/6/2010," and therefore, "[b]y definition, the PTSD is a direct consequence of that experience."

The lack of any traumatic event prior to the incident that could have caused the psychological disorders or conditions diagnosed by Dr. Knight in her Report was corroborated by Plaintiff's subsequent testimony at her deposition and 50-h hearing.  When asked directly at her deposition whether "[p]rior to the date of the incident … did you have any mental or emotional illness?" Plaintiff responded, "No." (Ashman Decl., Exh. 1, at 14-15)  As discussed herein, while Plaintiff mentioned she had a miscarriage of a pregnancy three years before the incident and Dr. Knight noted that in her Report, it was not in the

context of referring to the miscarriage as a traumatic event that could have caused her present PTSD.

Accordingly, Dr. Knight's ultimate opinion is "with a reasonable degree of psychological certainty that the police action on [August 6, 2010], during which Shadeesha was forced to stand naked for an extended period of time, is the primary etiological factor in the diagnoses indicated above." (Ashman Decl., Exh. 4, at pp. 8-9)  As for Plaintiff's prognosis, the Report concludes as of October 12, 2010, more than two months after the incident, that "she is still suffering from diminished pleasure, poor sleep and other signs and symptoms of the diagnoses," and "strongly recommend[ed]" at least monthly appointments for psychotherapy for one to three years, "the prognosis is fair to good that she will be able to finish her schooling and take pleasure in being a new mother." (Ashman Decl., Exh. 4, at p. 9)

## ARGUMENT

## I.

## DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S MEDICAL EXPERT'S TESTIMONY UNDER *DAUBERT* AND FEDERAL RULE OF EVIDENCE 702 SHOULD BE DENIED

As the Supreme Court stated in *Daubert*, "[T]he Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 596.  The reliability component of the inquiry into whether expert testimony is properly admissible is informed by the factors to be considered in Federal Rule of Evidence 702, which include whether "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and

methods to the facts of the case." Fed. R. Evid. 702(b), (c) & (d).   The Supreme Court has further emphasized that this inquiry into the reliability of expert witness testimony is "a flexible one," does not involve a "definitive checklist or test" of factors, and "must be 'tied to the facts' of a particular 'case.'"  *Daubert*, 509 U.S. at 593-594; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 591).

Defendants essentially argue the Dr. Knight's Report and her expert testimony should not be admissible at trial because they are unreliable in that they diagnose Plaintiff with PTSD and depression "without (1) taking any steps to verify Brown's statements; (2) probing into potentially traumatic events and Brown's mental state before the August 6th incident; or (3) addressing other likely alternative explanations for Brown's symptoms." Memorandum of Law In Support of Defendants' Motion ("Defs. Memo. of Law") at p. 6. But their arguments violate the principles enunciated in *Daubert* and *Kumho Tire* because they attempt to impose an inflexible checklist of actions that must be taken before expert testimony can be admissible, they ignore the circumstances in which Dr. Knight's expert opinion was rendered in this case, and they fail to consider how these standards have been applied in cases involving expert testimony regarding psychological disorders.

## A.  Dr. Knight's Evaluation and Report of Plaintiff's Condition Was Based On the Most Reliable Information Available

Defendants' basic contention that Dr. Knight should have collected further information verifying the accuracy of Plaintiff's account of what happened on August 6, 2010, and of the psychological problems and symptoms she was suffering, is unsupported by the circumstances of this case and the law.  (Defs. Mem. of Law at pp. 9-11)

First, there is nothing to suggest that what Plaintiff told Dr. Knight about the incident in their sessions together, or subsequently testified about it in her deposition and

50-h hearing, was materially incorrect. As previously discussed (see *supra*, at pp. 2-3, 4), the account of what had happened to her on August 6, 2010, that she told Dr. Knight was entirely consistent in its essential facts with what she testified to in the depositions. Moreover, the only parties who were actually there and could contradict what Plaintiff testified had happened during the incident are the Defendants themselves and the other police officers who were present in the apartment, whose identities were unknown to Ms. Brown. Was Dr. Knight required to interview them to verify what Plaintiff had told her?

Furthermore, Dr. Knight was evaluating Plaintiff during the first two months after the incident. Although Defendants make much of the fact that she was given Plaintiff's Notice of Claim to review (Defs. Mem. of Law at pp. 9-10), the simple fact was that there were no other records or reports that were available to her. No police report of the incident had been prepared that Plaintiff or her attorney was aware of, there were no medical records of psychological treatment because Plaintiff had never been treated for a psychological condition before and no records of Plaintiff's treatment after the incident because Dr. Knight was the first doctor she saw (Pl. Dep., Ashman Decl., Exh. 1, at p. 53), and her testimony at her 50-h hearing and deposition had not even occurred yet. This litigation had not even been filed.

Defendants' contention that Dr. Knight also was required, according to some checklist, to consult Plaintiff's family members or friends to verify that she actually was suffering from psychological symptoms and problems she was reporting is patently absurd. It is uncontested that Dr. Knight was well qualified, as a practicing psychologist and neuropsychologist, to evaluate and diagnose Plaintiff for conditions such as PTSD and depression, without interviewing her family or friends.

Similarly meritless are Defendants' efforts to exclude Dr. Knight's expert testimony and Report as unreliable by citing out-of-context statements from an article she had written about the development of her private practice in evaluating psychological and neuro-psychological injuries and testifying as an expert witness. (Defs. Mem. of Law at pp. 9-10) For instance, Defendants refer to the article as "indicating that she generally interviews family members and significant others and teachers" when conducting psychological evaluations (*id*, at p. 10) without mentioning what immediately follows: "In head injuries, especially, the patient often does not remember the injury. Therefore, getting input from someone close to the individual can be essential to get an impression what happened to the patient and how he or she has changed." (Article at pp. 188-89)[5]  By contrast, Dr. Knight observed and found Plaintiff to be an intelligent person, with "excellent" memory and "well tuned into her fears and feelings" who could reflect on and describe how she had changed as a result of the incident. (Ashman Decl., Exh. 4, at pp. 5-7)  Or Defendants quote from Dr. Knight's article that school records "are helpful to assess premorbid functioning following psychological trauma" in evaluating adolescents (Defs. Mem. of Law at p. 10 (quoting Article at p. 189)), but ignore the fact that Dr. Knight evaluated Plaintiff within little more than two months of the incident on August 6, 2010, and there surely were no school records describing her functioning following the trauma to review.

**B.   Dr. Knight's Diagnoses of Plaintiff's PTSD and Depression Have Sufficient Reliability To Be Admitted At Trial Under the More <u>Flexible Standards For Expert Testimony on Psychological Disorders</u>**

The many cases in which the same issue of the admissibility of an expert's

---

[5]   This citation refers to Dr. Knight's article, "Serving as an Expert Witness," appearing in a book, *Earning a Living Outside of Managed Mental Healthcare* (2010), a copy of which appears at Exhibit D to the Declaration of Martin S. Bloor In Support, dated March 13, 2013 ("Bloor Decl.")

testimony about a diagnosis of PTSD under the standards of *Daubert* and Federal Rule 702 has been raised, clearly reveal that the reliability of the expert's opinion and the evidence on which it is based, largely depends on the facts and circumstances in each case, not on a requisite checklist of information that must be gathered or sources who must be interviewed. See, *e.g.*, *Schaefer-Condulmari v. U.S. Airways Group, LLC*, No. CIV.A. 09-1146, 2012 WL 2920375 at *5 (E.D. Pa. July 18, 2012) (psychoanalyst's diagnosis of PTSA sufficiently reliable under *Daubert*, where based on "plaintiff's self-reporting", guidelines set forth in Diagnostic and Statistical Manual of Mental Disorders, and years of clinical practice, even though expert did not do "structured interview" of plaintiff, or administer any standardized tests); *Trafton v. Sunbury Primary Care, P.A.*, 689 F. Supp. 2d 198, 204 (D. Me. 2010) (family doctors' diagnoses of PTSD is reliable enough for admissibility when based on "personal interactions and observations" of plaintiff, prior medical records and medical training, though no "accepted test" was administered); *Lopez v. City of Houston*, No. CIV.A. H-03-2297, 2006 WL 1663374 at *8 (S.D. Tex. June 12, 2006) (discussed below); *Redmond v. City of East Point, Ga.*, No. 1:00-CV-2492-WEJ, 2004 WL 6060552 at **6-10 (N.D. Ga. Mar. 29, 2004) (doctor's diagnosis of PTSD not excluded on basis of unreliability despite fact that information provided by plaintiff was accepted as true, "battery of psychological tests" was not administered, and little inquiry was done "on plaintiff's family history and past emotional traumas").

The decision in *Lopez*, which also involved a diagnosis of PTSD arising from plaintiffs' detention and arrest by police in a heavily-armed raid, is instructive here. While Defendants, as here, did not challenge the qualifications of plaintiffs' experts to diagnose PTSD, they did challenge and seek to exclude the experts' diagnoses and opinions "on the

grounds that they lack reliability generally and that the methodology used to reach the opinions is faulty in various respects." 2006 WL 1663374 at *4. Specifically, they challenged the experts' use of "background information" about plaintiffs created by others, their failure "to consider events in Plaintiffs' lives ... that might have caused PTSD," their failure to use "other recognized diagnostic scales" or "sufficiently diverse sources of information regarding reported symptoms", and their failure to "perform a differential diagnosis to rule out other potential causes of the reported symptoms." *Id.* at *4.

The court in *Lopez* denied defendants' motion to exclude the experts' diagnosis of PTSD (as well as their opinion that the raids had caused plaintiffs' PTSD as discussed below), concluding, "Based on the available record, the Court holds that Plaintiffs' Experts' methods are logical and sufficiently reliable to support admissibility of the experts' diagnoses. Plaintiffs' Experts' methods as presented in the record ... are consistent with generally accepted psychotherapy practices." *Id.* at *6. Rather, Defendant's challenges "all are suitable for jury consideration at trial. This Court, an evidentiary gatekeeper, may not assess the correctness or persuasiveness of Plaintiffs' Experts' opinions." *Id.* at *10. As for the defendants' challenge that the experts did not rely on sufficiently diverse sources of information or did not question the credibility of what plaintiffs had told them, the court concluded,

> Indeed, *there is no evidence that any Plaintiff misrepresented their medical histories, the events in issue, or their symptoms to Plaintiffs' Experts.* Thus, again, *the experts' failure to interview more family members and friends before reaching the PTSD diagnoses is a matter for the jury to consider* in determining the weight to give the Experts' opinions.

*Id.* at *9 (emphasis added).

In light of the circumstances in this case, Dr. Knight's expert diagnoses of Plaintiff's psychological conditions are soundly grounded on her qualifications to talk with and question Plaintiff and observe her demeanor and behavior, to administer and interpret the results of three widely-recognized objective psychological tests (one geared specifically to diagnosing PTSD), and her exercise of her professional skills and judgment. As previously discussed, there realistically were no other sources of information available to her at the time she evaluated Plaintiff that would have significantly added to the reliability of her diagnoses.

Furthermore, courts have recognized that diagnosis of psychological disorders is not an exact science and doctor's opinions about the psychological condition of a person often can vary. Refusing to exclude a doctor's diagnosis of PTSD based on debatable criteria under *Daubert*, the Ninth Circuit has stated:

> As commentators have repeatedly observed, "mental health professionals involved in everyday practice may disagree more than half the time even on major diagnostic categories such as schizophrenia and organic brain syndrome." Christopher Slobogin, *Doubts About Daubert: Psychiatrict Anecdata as a Case Study*, 57 Wash. & Lee L.Rev. 919, 920 (2000). Therefore, a variance from the [Diagnostic and Statistical Manual of Mental Disorders'] diagnostic criteria will not automatically result in an unreliable diagnosis.

*S.M. v. J.K.*, 262 F.3d 914, 921 (9th Cir. 2001), amended on other grounds, 315 F.3d 1058 (9th Cir. 2003); see also *Lopez*, 2006 WL 166374 at *6 ("This flexible approach is appropriate when considering the admissibility of a mental disorder diagnosis, which relies more heavily on a psychological expert's professional judgment than diagnoses of more tangible physical illnesses, such as broken bones."). Because of this recognized propensity for doctors to differ in their diagnosis of psychological disorders, it is especially telling that Defendants are not offering their own expert witness to testify about Plaintiff's

psychological condition and contradict Dr. Knight's diagnosis at trial.  See *Lopez*, 2006 WL 1663374 at *10 (denial of defendant's motion to exclude expert's testimony of diagnosis and etiology of plaintiff's PTSD where among other things, "[d]efendant presents no expert testimony to support any of its contentions").

Because of these considerations, courts have expressed a greater reluctance to exclude expert opinions on PTSD and other psychological conditions under the reliability standards of *Daubert* and Federal Rule of Evidence 702.  See also *Trafton*, 689 F. Supp. 2d at 203-4; *Foreman v. American Road Lines, Inc.*, 623 F. Supp. 2d 1327, 1335-36 (S.D. Ala. 2008); *Mancuso v. Consolidated Edison Co. of New York, Inc.*, 967 F. Supp. 1437, 1456 (S.D.N.Y. 1997).

**C.   Dr. Knight's Testimony As to the Etiology of Plaintiff's Psychological Disorders Is Sufficiently Reliable To Be Admitted At Trial and Its Credibility and Weight Should Be Decided By the Jury**

Defendants' final contention – that Dr. Knight failed to account for alternative traumatic events occurring before the incident involving them that could have caused her PTSD and depression (Defs. Mem. of Law at pp,12-13) – is not supported by the circumstances of this case and the relevant case law.

First, Defendants have failed to present any plausible evidence that a prior traumatic event could have caused Plaintiff's psychological injuries.  Rather, they do precisely what they erroneously accuse Plaintiff of doing - engaging in sheer speculation about whether a prior miscarriage or the absence of her father as a child could have caused her PTSD and related depression.   As Dr. Knight related in her Report, the key component of a PTSD diagnosis is that the person "was exposed to a traumatic event in which she felt there was a potential threat to her physical integrity to which she responded with intense feelings of

fear and helplessness." (Ashman Decl., Exh. 4, at p. 7)   But Plaintiff did not mention in recounting her history to Dr. Knight any similarly traumatic events, experiences or feelings occurring to her before this incident, and Dr. Knight's Report found "no evidence" that Shadeesha had any of the symptoms of PTSD prior to the incident. (*Id.* at p. 8)  Thus, Dr. Knight logically concluded that Plaintiff's encounter with Defendants constituted such a "traumatic event," and that it had had capability of causing the symptoms of PTSD that Plaintiff was experiencing, which "cause[d] significant distress and impairment in Shadeesha's social and cognitive areas of functioning." (*Id.*)

Defendants freely speculate that there may have been other traumatic events in her life that could have caused Plaintiff's post-incident PTSD and depression – whether it be "a miscarriage around age 15 or 16," "a possible history of physical or sexual abuse," or her "abandonment by her father at a young age." (Defs. Mem. of Law at p. 12)  But they have presented no evidence that any of these events actually caused Plaintiff such emotional or psychological trauma (nor even whether one – "a possible history of physical or sexual abuse" – ever occurred).   Nor can they explain how these events could have caused her PTSD or depression when there is no evidence she suffered any pre-incident psychological symptoms or had any medical treatment and they only manifested themselves after the August 6, 2010 incident.

Plaintiff did in fact inform Dr. Knight of her earlier miscarriage and it is included in the Report.  But Plaintiff did not in any way suggest that the miscarriage was the source or cause of her present psychological problems; rather, she attributed the miscarriage "to stress from her former boyfriend." (Ashman Decl., Exh. 4, at p. 3)  Moreover, she

mentioned it in the context of her saying she "worried that the stress she still felt from the incident with the police could result in another miscarriage." (*Id.*)

In any case, Dr. Knight mentioned in her Report, and testified in her subsequent deposition, that she had considered whether the prior miscarriage could have caused Plaintiff's post-incident PTSD and depression, and had ruled it out as an etiological factor. As she concluded in her Report,

> There is no evidence that Shadeesha had any of the difficulties enumerated above prior to the incident with the police on 8/6/2010. By definition, the PTSD is a direct consequence of that experience. It is therefore my opinion with a reasonable degree of psychological certainty that the police action on that day, during which Shadeesha was forced to stand naked for an extended period of time, is the primary etiological factor in the diagnoses indicated above.

*Id.* at pp. 8-9.   In addition to Dr. Knight's consideration of all the available information and the exercise of her professional judgment in assessing the etiology of Plaintiff's PTSD and depression, it defies common sense that Plaintiff's symptoms, fears, thoughts and nightmares would focus on associations with police officers, being naked or without clothes, intruders breaking in on her, the area and people associated with the incident, but not have their etiology in the incident on August 6, 2010.

Moreover, even assuming there were some substance to Defendants' challenges to the sufficiency of Dr. Knight's consideration of alternative events that could have caused Plaintiff's psychological disorders, which there is not, the proper remedy is not to exclude her report and testimony under *Daubert*. The Supreme Court in *Kumbo Tire* referred to *Daubert* for the proposition that a judge may admit expert testimony if it falls within "the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'" 526 U.S. at

17

153 (citing *Daubert*, 509 U.S. at 596).   And as *Daubert* clearly stated with respect to expert witness testimony, "*Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.*" 509 U.S. at 596 (emphasis added).  Therefore, even if Dr. Knight's Report and testimony about Plaintiff's diagnosis of PTSD and depression were not considered completely reliable (which they are), they are certainly within "the range where experts might reasonably differ" and should be admitted at trial and the jury should decide their credibility and reliability.

Consequently, courts have held that the reliability of an expert's testimony about psychological disorders with respect to whether alternative causes were adequately considered should be determined as an issue of credibility by the jury.  See, *e.g.*, *Schaefer-Condulmari*, 2012 WL 2920375 at *5 (contention that expert "did not rule out other possible causes of the plaintiff's alleged mental injury, such as other past traumatic events" is issue "more appropriate to cross-examination than exclusion under *Daubert*"); *Discepolo v. Gorgone*, 399 F. Supp. 2d 123, 128, 129 (D. Conn. 2005) (doctor's expert testimony that sexual assault "played a 'major role' in plaintiff's [PTSD], based both on the timing and severity of those other events" was reliable for purposes of admissibility and "cross-examination can effectively reveal to the jury inaccuracies, imprecision, or fallacies in [expert's] analysis to enable the jury to decide" how much of his testimony to credit and what weight to give it); See *Katt v. City of New York*, 151 F. Supp. 2d 313, 324 (S.D.N.Y. 2001) (admitting psychologist's expert opinion that "the harassment perpetrated by [defendant police officers] triggered the condition that has caused her debilitated psychological state," where plaintiff "had other psychological problems before

working for the NYPD, and experienced traumatic events in her personal life during her employment there"), *aff'd in part sub nom. Krohn v. New York City Police Dept.*, 60 Fed. Appx. 357 (2d Cir. 2003).

Admitting expert testimony at trial is especially appropriate where, as here, "[d]efendant presents no expert testimony to support any of its contentions," and only attacks the sufficiency of plaintiff's expert. *Lopez*, 2006 WL 1663374 at *10. Therefore, any challenges Defendants may have to the accuracy or substantiality of Dr. Knight's expert testimony as to the diagnoses and etiology of Plaintiff's psychological injuries should be raised through cross-examination of her at trial.

## CONCLUSION

For the reasons presented here, Defendants' motion to exclude Dr. Knight's report and expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 570 (1993) and Federal Rule of Evidence 702 should be denied in its entirety, and her testimony should be deemed admissible at trial.

Dated: New York, N.Y.
          April 3, 2013

                                        Respectfully submitted,


                                        By:   s/ Richard A. Ashman
                                              Richard A. Ashman
                                              Eugene M. Bellin
                                              Michelstein & Associates, PLLC
                                              Attorneys for Plaintiff
                                              485 Madison Avenue
                                              New York, New York 10016
                                              (212) 588-0880